Hidalgo County Drainage District v. R. V. Davidson, Attorney-General.

No. 1999.   Decided June 23, 1909.

**1.—Drainage Bonds—Attorney-General's Certificate.**

The Attorney-General is not required to make the certificate provided in section 24 of the Act of March 23, 1907 (Laws, 30th Leg., pp. 78, 84), as to the validity of the bonds to be issued by a drainage district until the bonds have been executed by the county authorities and presented to him to be so certified before their issuance by the district. (P. 543.)

**2.—Same—Words and Phrases—Issue—Copy.**

The word "issue" in section 24 of the Act of March 23, 1907, means put in circulation or sell, by the drainage district, the bonds executed for that purpose by the county authorities; and the "copy" of the bonds to be issued means one of such series or set of printed bonds, to which, when they have been executed, the certificate of the Attorney-General is to be appended. Mandamus will not lie to require such certification until the bonds have been executed and presented to him. (P. 544.)

Original application to the Supreme Court, by the drainage district, for writ of mandamus against the Attorney-General.

*D. B. Chapin* and *Clark, Bliss & Lytle,* for relator.—The statute does not leave it to the discretion of the Attorney-General as to the certification of the bonds, but makes it his imperative duty to certify them if they have been issued in conformity with the Constitution and laws, and are valid and existing obligations. Sec. 24, chap. 40, Acts 1907, p. 84.

The opinion of the Attorney-General as to a question of law is not conclusive upon the courts, and an attempt of the Legislature to make it so would violate the Constitution as being an invasion of the province of the Judicial Department of the State. Lytle v. Halff, 75 Texas, 132, 133.

While the finding of the Attorney-General upon a disputed question of fact material to the validity of the bonds would doubtless be conclusive, yet when he has found all the facts, and these facts so found show that all the requirements of the Constitution and laws have been complied with, necessary to make the bonds valid and existing obligations, his discretion ceases and the duty to certify them becomes a ministerial duty which will be enforced by mandamus. Sansom v. Mercer, 68 Texas, 488; Texas Tram & Lumber Co. v. Hightower, 100 Texas, 126; Terrell v. Greene, 88 Texas, 539; Keller v. Hewitt, 109 Cal., 146; State v. Board of Health, 103 Mo., 22; State Board of D. E. v. People, 123 Ill., 227; United States v. Schurz, 102 U. S., 378; Butterworth v. United States, 112 U. S., 50; Gilchrist v. Collector, 5 Hughes, 1; Thomas v. Armstrong, 7 Cal., 286; Daniels v. Miller, 8 Colo., 542; Gulick v. New, 14 Ind., 93; Copeland v. State, 126 Ind., 51; State ex rel. Taylor v. Warrick County, 124 Ind., 554; Harwood v. Quinby, 44 Iowa, 385; State ex rel. Cameron v. Shannon, 133 Mo., 139; State ex rel. Johnson v. Lutz, 136 Mo., 633; State ex rel. Stokes v. Camden County, 35 N. J. L., 217; People ex rel. Ziegler v. Collis, 45 N. Y. Supp., 282; Commonwealth ex rel. Century Co. v. Philadelphia, 176 Pa., 588.

The Act approved March 23, 1907, authorizing the commissioners courts to establish drainage districts confers upon the county commissioners court exclusive jurisdiction to hear and determine all contests and objections to the creation of such district and all other matters pertaining to the same; it was the duty of the said court, before ordering the election, to determine whether the requisite number of freehold resident citizens taxpayers in the proposed district had signed the petition for the establishment of the district; and said court having ordered the election to be held, it is conclusively presumed in this collateral proceeding that said court did its duty and ascertained that said requisite number of freehold resident citizens in said district had signed said petition. Acts 1907, p. 79, ch. 40, secs. 2, 3; State v. Goodwin, 69 Texas, 55; Von Hostrup v. Madison, 1 Wall., 291.

The statute does not require that the petition shall set forth that the signers are freehold resident citizens taxpayers in the proposed district, but, on the contrary, by implication at least, shows that this is not required, for the statute requires that the petition shall set forth the necessity, feasibility, utility, etc., without mentioning any such requirement, and the rule "expressio unius est exclusio alterius" applies. Acts 1907, p. 79, ch. 40, sec. 2; Sutherland Statutory Construction, secs. 325, 326, 327; Rex v. Woodland, 2 East, 166; Rex v. Bell, 7 T. R., 594; Rex v. Cunningham, 5 East, 478.

The purpose of the statute in requiring the signatures of a certain number of freehold resident citizens taxpayers of the proposed district to a petition for the establishment of the drainage district before the county commissioners court is required to set the matter down for a hearing is to prevent useless expense, waste of time and labor where there exists no desire on the part of a large proportion of the voters for the establishment of the district and where the measure would probably be defeated should an election be

ordered.  Scarbrough v. Eubank, 93 Texas, 106; Currie v. Paulson, 43 Minn., 411.

The main purpose of the statute is to permit a drainage district to be established where two-thirds of the resident property taxpayers of the district voting at an election held for determining the question have by their votes signified their desire for the establishment of such district, and the drainage of such district is feasible, practicable, is needed, would be conducive to the public health or would be a public utility or a public benefit; and the statute should be construed to effectuate this main purpose.

So, if the drainage of a district is found by the county commissioners court, at a hearing of which proper notice is given, to be feasible, practicable, needed, conducive to public health and a public benefit, and an election is ordered, due notice thereof given and two-thirds of the property taxpayers resident citizens of such district vote in favor of the establishment of such district and the issuance of bonds to provide funds to pay for the drainage of the district, such election would not be void even if the county commissioners court should have made a mistake and should have set the matter down for a hearing on the petition of an insufficient number of qualified voters; and the bonds issued in pursuance of the result of such election would be valid.  Scarbrough v. Eubank, 93 Texas, 106; Currie v. Paulson, 43 Minn., 411.

For the stronger reason in the case at bar where all the freehold property taxpayers resident citizens in the district actually signed the petition for the establishment of the district setting forth the necessity, public utility, and feasibility as well as the boundaries thereof, where the matter has been duly set down for a hearing and full notice given, where no objection whatever was presented to the establishment of the district, where an election was duly ordered to determine the question as to whether such district should be established and bonds issued, where due notice was given of such election and where it is shown that the qualified voters of the district at said election voted practically unanimously in favor of the establishment of the district and the issuance of bonds, should the bonds issued in pursuance of such election be held valid.  Scarbrough v. Eubank, 93 Texas, 106; State v. Goodwin, 69 Texas, 55; Currie v. Paulson, 43 Minn., 411.

*Robert V. Davidson* Attorney-General, and *J. T. Sluder,* Assistant, for respondent.

MR. JUSTICE BROWN delivered the opinion of the court.

The Drainage District by its Commissioners filed its petition in this court against R. V. Davidson, Attorney General, in which it set up with great particularity, not necessary to be followed in this statement, a compliance with all of the acts required by an Act of the Legislature, approved March 23, 1907, authorizing the Commissioners Court to establish drainage districts.  (See Laws 30th Leg., p. 78.)  The formation of the district by the County Court upon a petition as required by the statute, the holding of the

election under the law, the surveying and plotting of the canals, etc., by the engineer, and in fact all of the minutia prescribed by the said Act is shown to have been complied with, and the Commissioners Court on the 10th day of May, 1909, entered an order in conformity with the requirements of the statute authorizing the bonds of the district to be issued in the sum of $176,000, and at the same time making a levy of 48 cents on the one hundred dollars' valuation to raise a fund with which to pay the interest and sinking fund on the said bonds. It is alleged that the bonds did not exceed one-fourth of the taxable value of the property in the district and that in all particulars mentioned by the statute the said court had complied with law in conducting the said matter until the time came for the issuing of the bonds. It is not alleged that any bonds were ever prepared, printed or lithographed, signed or in any way executed by the officers of the said county or the Drainage District, but it is alleged in the said petition that before offering the said bonds for sale the said officers of the Drainage District sent to R. V. Davidson, Attorney-General, at Austin, a copy of the bonds with all of the data which the law required to be submitted to him, for his examination and that he examined the same and refused to approve them, because of certain objections specified in a letter written to the parties representing the said district, among which was the fact that it did not appear in the petition for the creation of the district that the signers were resident taxpayers of the said district. The petition prays that said Attorney-General be required to make the certificate prescribed by law that said bonds were issued in conformity with the Constitution and laws of this State and that they are valid and binding obligations on the said district by which they were issued.

The Attorney-General answered the petition by general and special demurrer and by the following statement of facts showing the reason why he should not be required to make such certificate:

"1st. That a transcript of the proceedings for the issuance of bonds by this district was presented by and on behalf of the Commissioners Court to the Attorney General's department for approval; that the same was rejected and disapproved for the following reasons:

"(a) The petition to the Commissioners Court for the establishment of said Drainage District and issuance of bonds therefor did not recite that the signers thereof resided within the proposed Drainage District.

"(b) That said petition did not recite that the lands of said petitioners were incorporated within the boundaries of said proposed district.

"(c) That said petition did not show or recite that as many as twenty-five of the signers of said petition were freehold resident property taxpayers of said proposed district, nor did it recite that a third of said freehold property taxpayers of said district had signed said petition; which reason for rejecting said proceedings were embodied in an opinion to D. B. Chapin, dated March 30, 1909, a true copy of which opinion is hereto attached, marked 'Exhibit A'

and made a part hereof. That said opinion contains all of the reasons of the Attorney-General for refusing to approve the transcript of the proceedings for the issuance of said bonds.

"2d. That no bonds of said Drainage District have ever been presented to the Attorney-General or to the Attorney-General's Department for approval."

The Attorney-General objects that the relator has never presented to him or to his department any bonds and that the circumstances have not transpired which would authorize him to act upon the validity of the bonds. If that be correct then it necessarily terminates this proceeding, therefore we will first examine the statute to ascertain if the facts alleged and admitted show that any duty has been devolved upon the Attorney-General or his department in connection with the bonds.

The language of the 24th section of the Act is in some respects ambiguous, and in order to determine what is its effect, we must first reach a conclusion as to the meaning of certain words used in that section. In determining the sense in which the language was used by the Legislature we will look to the context and to the purpose of the Legislature in enacting the law.

The procedure by which a Drainage District may be created, organized and the steps preceding the issuing of bonds are provided for in the first twenty-one sections of the Act. When the requirements of the law have been complied with the Commissioners Court of the county is required by section 22 of the Act to make an order directing the issuance of drainage bonds for the district sufficient to pay for the proposed improvements, not to exceed one-fourth of the assessed value of the real estate in the district. Section 23 directs that the bonds be signed by the county judge and attested by the clerk of the County Court with the seal of his office attached and shall be issued in denominations of not less than one hundred nor more than one thousand dollars each, and shall bear interest not exceeding five percent per annum; that the bonds and interest shall be made payable at the county treasurer's office of the county and shall run for a period not to exceed forty years. Up to this point the drainage district has had nothing to do with the bonds. The word "issued" as used in section 23 evidently means to execute, that is, to perform the acts specified—the signing and attesting by the officers.

A compliance with the law up to this point prepares the bonds, making them ready for the market and places the bonds under the control of the drainage district. Section 24 prescribes the proceeding by which such bonds may be submitted to the Attorney-General for his inspection. "Any drainage district in the State of Texas desiring to issue bonds in accordance with this Act," means that any district for which the bonds have been prepared, which desires to put the same in circulation by sale, shall then proceed as thereafter directed. "Issue," as here used, means to put into circulation—to sell the bonds. (Words & Phrases, vol. 4, word "issue.") That is, before offering the bonds for sale, or, in other words, issuing them, the district shall "forward to the Attorney-General a copy

of the bonds to be issued" with other data specified in the said section. "The bonds to be issued" means the bonds which are to be offered for sale, and not bonds which are to be prepared and executed. "Copy of the bonds" means that one of the bonds so prepared shall be forwarded to the Attorney-General for his inspection and examination. The word "copy" as here used has the meaning of "one of a set or number of reproductions or imitations containing the same matter, having the same form and appearance, or executed in the same style, etc., as, for instance, a copy of the book printed sixty years ago." (Century Dictionary, word "copy," sub. 3.) The word is often used in this sense with reference to such things as are executed in numbers, as the publication of a book. We speak of having a copy of a certain book, while, in fact, it is but one of a great number of productions from the same plates containing the same matter. We think it plain that the purpose of the law was that after the bonds had been prepared and ready for sale they should be submitted to the Attorney-General for examination, and that as all the bonds would be the same in substance and form the submission of one would be equivalent to the submission of all and an examination of one would determine the validity of each and all of them. This conclusion is strengthened by the further provision that if the Attorney-General upon examination of such bonds is satisfied, he shall make a certificate to that effect, which must be "attached thereto." He is required to make but one certificate and "thereto" could not refer to each of the bonds, because one certificate could not be attached to more than one bond; the natural construction of this language is that the officer shall attach his certificate to the bond which he has examined. Support is given to this construction by the fact that when all of the bonds have been deposited with the Comptroller he is required to register each of them in a book to be kept for that purpose and shall preserve the certificate of the Attorney-General, which requires that it should be detached from the bond to which it had been attached to be preserved in the Comptroller's office for use by anyone who might have occasion for it. When the bonds have all been prepared, as required by law, when the certified copies of all proceedings have been submitted to the Attorney General, as required by section 24, and he has examined the copy of the bond furnished to him in connection with that data, if found correct, he could safely certify that the "bonds were issued in conformity with the Constitution and laws and that they are valid and binding obligations upon such drainage district." The bonds being all alike and produced by the same procedure, we repeat, the examination of one would determine the validity of all.

It follows from this construction of the statute that the bonds are not ready to be submitted to the Attorney-General until they have been prepared, that is, printed or lithographed, signed and sealed by the proper officers, that is, executed in the form required by the statute, and as no such bonds had been prepared prior to the presentation of this matter to the Attorney-General, the law did not require

him to pass upon any question which might arise as to the validity of the preparatory proceedings.

The contention of the relator seems to be that it was the intention of the Legislature before bonds were prepared for sale that a copy of such bonds should be submitted to the Attorney-General for his examination. There could be no copy of bonds which did not exist and it would strain liberal construction to say that the word "copy" meant that the Drainage District might prepare a form in which the bonds were to be executed thereafter and submit that for examination by the Attorney-General, calling upon him to pass upon and certify to the validity of bonds which might be issued in future. With due respect to the argument of relator's counsel we think it would be absurd to say that a public official could be required to certify to facts which had not transpired; to declare valid and binding obligations bonds which had not received the signature of the officers authorized to execute them. The language of the 24th and 25th sections of the Act forbid such an interpretation. The law does not authorize the Drainage District to take the opinion of the Attorney-General as to whether under the preparatory procedure already had it may issue valid bonds, but it requires such district, after the county officials have executed the bonds in conformity with the law, to submit the matter to the Attorney-General to decide whether or not the bonds have been properly prepared.

We conclude that the relator shows no right to have the Attorney-General make the certificate which he seeks by means of the mandamus from this court. It is therefore ordered that the writ of mandamus do not issue and that the Attorney-General go hence, and that the relator pay all costs of this proceeding.

*Mandamus refused.*