PEOPLE v. BULLOCK.

CRIMINAL LAW—ISSUANCE AND SALE OF SECURITIES—INFORMATION —INSTRUCTION.

In prosecution of defendant under an information charging him with unlawfully aiding in the issuance of stock in violation of statute regulating issuance of stock by certain public utilities corporations, where there is some evidence that defendant did aid in the issuance of some stock and he is shown to have participated in the sale thereof, instruction given by court tending to confuse jury by indiscriminate use of "sale" and "issuance" of stock which resulted in conviction "violating securities law" *held*, reversible error, requiring a new trial (2 Comp. Laws 1929, §§ 11077, 11079).

CHANDLER and BUTZEL, JJ., dissenting as to new trial.

Appeal from Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted January 14, 1943. (Docket No. 96, Calendar No. 41,980.) Decided May 18, 1943.

Dewey Bullock, charged with unlawfully aiding in the issuance of stock, was convicted of violating the securities law. Reversed and new trial granted.

*Allaben & Wiarda (Kenneth T. Hayes,* of counsel), for appellant.

*Herbert J. Rushton,* Attorney General, *Menso R. Bolt,* Prosecuting Attorney, and *Arnold R. Levandoski,* Assistant Prosecuting Attorney, for the people.

BUTZEL, J. (*dissenting as to new trial*). Dewey Bullock, as stated in the jury's verdict, was found guilty of the crime of "violating securities law." In the original complaint, Bullock together with one T. David French was complained of for "causing to be issued" 1,783 shares of preferred stock of the Middleville Power Corporation without the authorization necessary under the provisions of 2 Comp. Laws 1929, § 11077 (Stat. Ann. § 22.101), and in violation of 2 Comp. Laws 1929, § 11079 (Stat. Ann. § 22.103). French pleaded guilty. After examination in the police court Bullock was bound over for trial to the superior court of Grand Rapids, the information charging Bullock with unlawfully aiding in the issuance of the stock and referring to the two sections cited.

The facts in the case are very involved and we shall give a very brief outline of them. Evidently French's reputation prior to the events here related

was very good. He had been a resident of the city of Middleville, Michigan, and as a result of his efforts in the promotion and acquisition of property, he had acquired water and property rights for the construction and ownership of two water power dams, which according to his testimony were built and are now operating. Tentative arrangements had been made for sale of the power to a large public utility corporation. On August 11, 1937, articles of incorporation were executed for the organization of a corporation known as the Middleville Power Corporation, with an authorized capital of 1,500 shares of preferred stock with a par value of $50 per share, and 125,000 shares of common stock with a par value of $1 per share. French subscribed for 10,000 shares of common stock. Two other incorporators subscribed for nominal amounts. The articles were filed May 27, 1938. French was in sole control of the corporation and the issuance of its stock at all times, it being from the start a "one-man corporation." On April 19, 1938, the Michigan public utilities commission had authorized the incorporation of the Middleville Power Corporation and ordered that the corporation, upon receiving proper transfer of the properties to be used for water power dam purposes, issue to the incorporators common stock of the par value of $125,000. It further ordered that "said corporation be and it is herewith authorized to issue to the incorporators preferred stock of the par value of $50,000 on receipt of payment therefor by the corporation of the sum of $50,000 from said recipient incorporators;" that the balance of the preferred stock in the amount of $25,000 be not issued but remain unissued in the treasury of the corporation until further orders. It further ordered:

"That said incorporators shall not sell nor offer for sale, nor transfer any of the stock to be issued to them under the terms of this order without first obtaining an order from this commission authorizing them to sell or transfer their said shares of stock."

The commission reserved jurisdiction of the entire matter with the right to enter other further orders; that if it found after completion of the project that the company's valuation exceeded that found by the commission, the company should thereupon be required to cancel any portion of the 125,000 shares issued in an amount equivalent to the difference between the company's and the commission's valuation.

In December, 1937, French had met Roger Verseput, Jr., of Roger Verseput & Company of Grand Rapids, a brokerage concern by whom Bullock had been employed to sell Federal housing insured mortgages to banks. Bullock formerly had worked for a medical research laboratory and later had sold F.H.A. mortgages. He had an excellent reputation. In selling F.H.A. mortgages he had come in contact with several insurance companies and was, therefore, designated by Verseput as a broker or agent to try to interest some of the insurance companies in purchasing a contemplated bond issue secured by a mortgage on the Middleville Power property. Verseput told Bullock of the high standing of French and his family, the length of time they had lived in Middleville, et cetera. Bullock after interviewing a number of insurance companies finally secured a definite commitment from a large Indiana life insurance company for a loan of $175,000 to be made on completion of the construction of the power plant. The loan, however, was never consummated

because of the inability of the company to secure finances for construction purposes.

Shortly after Bullock secured the commitment for the prospective loan, Mr. Verseput called in Bullock and two other salesmen and told them that Verseput & Company was in financial difficulties and required immediate funds; that the concern had misappropriated trust funds, and unless it could obtain some additional capital, it would be obliged to close up. Mr. French after a conference with Mr. Verseput was persuaded to advance some ten or eleven thousand dollars to Verseput & Company, the amount to be applied against the commission to become due when the Indiana life insurance company loan was consummated. Mr. French was given control of the brokerage concern, although the stock was issued in the name of Bullock to be held in trust partly for Bullock and partly for French. This was done so as to keep the public uninformed of the fact that the stock of the brokerage concern had been taken over by outsiders. Bullock agreed to forego his share of the commission and add it to the capital of the brokerage concern. The stock interests in the brokerage company were thus changed and Bullock was made president although he was without previous experience in the management of the securities business. On June 7, 1938, Bullock made his first appearance at a meeting of the stockholders and directors.

In September, 1938, the sale of the Middleville Power Corporation preferred stock was discussed. On September 20, 1938, negotiations and correspondence took place between the Middleville Power Corporation and the Michigan public utilities commission. A petition was presented to the commission by French to sell 500 shares of the preferred stock, which he stated he had paid for, for the purpose of using the proceeds for construction of dams and

power houses, the construction of which was in progress. In a letter dated October 4, 1938, written by the commission, addressed to French's attorney and signed by its vice-chairman, it was stated that the commission understood that the stock contemplated to be sold was taken from the holdings of Mr. French for which he had paid the full par value in cash to the corporation, and that this stock had been affirmatively passed upon by the commission; that in securing the commission's further order permitting resale of this stock, it would be necessary for Mr. French to secure preliminary commitments from such of his friends as might desire upon their own investigation and appraisal of the project to risk an investment therein; that such course would seem to be an appropriate one under *Leelanau Transit Co. v. Houdek,* 239 Mich. 101. It further stated that the securities had all been passed upon by the commission and an order allowing sale to Mr. French had been issued, and that ,if the subscribers then would present their own petition to the commission, with Mr. French joining, ''for the present resale, the commission would then understand that the subscribers were satisfied to proceed at their own risk, in fact, such showing should be made with your supplemental petition.'' A form of subscription was prepared and circulated. Although Bullock knew the contents of the form and told the company's salesmen to use it when selling stock, he also knew that the stock was being sold without it.

Bullock, however, made no direct sales of this stock, though in a few instances, in which a small number of shares was involved, he assisted other salesmen by recommending the stock to prospective purchasers. He also presided at several meetings of the salesmen of Verseput & Company where the sale of the preferred stock was discussed and urged. This was the full extent of his active par-

ticipation in the sale of the Middleville Power Corporation's preferred stock. Bullock was absent from Grand Rapids at frequent intervals after French acquired his interest. At one time he was away for a period of almost seven months. He was occupied for the greater part of his time with the sale of the securities of another corporation in which the brokerage concern was interested. French took an active part in both the financing of the Middleville project and in the issuance of its securities. He handled all the negotiations with the utilities commission; he appointed the transfer agent who had charge of the stock certificate book; he signed the certificates that were issued, and he received the proceeds from sales. No sales were credited to defendant, nor did his name appear on any of the records of the Middleville Power Corporation. When called as a witness by the prosecution, French testified that Bullock had nothing whatsoever to do with the power company or the issuance of its stock, and that the only way he would benefit by the sale would be through his interest in the brokerage concern. However, French's testimony became of little value not only because he had been convicted of the fraudulent issue of the stock but also, after he gave testimony covering many pages of the record, he finally availed himself of the constitutional right against self incrimination and refused to testify whether he paid $50,000 for the stock he received as an incorporator. Although French sold not only the 500 shares preferred stock but considerably more, and even ordered an additional certificate book from which he secretly issued stock from time to time, he testified that he put about $75,000 into the power company.

Finally, because of his frequent absences, Bullock was called upon to resign from Verseput &

Company and on March 21, 1940, he surrendered his stock and relinquished his control over the management. Up to the time when Bullock's connection with the company terminated, 1,018 shares had been sold for only a small part of which subscriptions were taken. After Bullock withdrew, the brokerage concern sold an additional 694 shares. At the trial over 50 purchasers of this stock were called as witnesses before the jury and testified to their purchases.

We need not discuss whether the verdict was against the great weight of the evidence, or the many other questions raised by defendant on appeal. The case was very thoroughly tried on behalf of the people. There is no question but that authorization for a general public sale was never given, that Mr. French issued preferred stock in excess of that authorized, and that in all instances the conditions imposed by the commission were not observed. Section 3 of the statute regulating the issuance of stock by the operators of public utilities (2 Comp. Laws 1929, § 11077 *et seq.* [Stat. Ann. § 22.101 *et seq.*]) provides a penalty for the violation of three distinct provisions of the act: (a) causing unauthorized stock to be issued; (b) aiding in the issuing of unauthorized stock; and (c) failing to comply with the terms and conditions imposed by the commission after issuing authorized stock. There may be some question as to whether, after the issuance of the authorized preferred stock, defendant could be held for failure to comply with the terms and conditions imposed. He, however, was not charged with this offense and it need not be considered.

Defendant was informed against for aiding in an unauthorized issuance, but the record supports defendant's contention that he was convicted not of

this offense as charged in the information but for activities in connection with the sale of the stock in violation of the blue sky law, 2 Comp. Laws 1929, §§ 9771, 9772, as amended by Act No. 37, Pub. Acts 1935 (Comp. Laws Supp. 1940, § 9771, Stat. Ann. § 19.743), or some other law. Thus an examiner for the Michigan corporation and securities commission was permitted to testify that Verseput & Company was summoned before the commission to show cause why its brokerage license should not be cancelled on account of its dealings in the power corporation's preferred stock, but his further testimony that the commission dismissed the charges appearing in its citation was stricken from the record. The trial judge instructed the jury that since there never had been any authorization by the utilities commission for the sale or resale of the stock, there was an illegal sale of stock and the jury need not debate whether the stock was authorized to be sold or not. It then proceeded to use the words "issue," "sale," and "dispose" interchangeably, giving the impression that if defendant aided in the sale of the securities he could be convicted for aiding in their issuance. We can readily see how the jury confused the terms "issue" and "sale" and rendered a verdict that defendant was guilty of the crime of "violating securities law." Finally, the trial judge denied defendant's motion to dismiss on the ground that defendant knew of the sale and transfer of the stock and knew also that the transfer had not been approved by the securities commission.

The averments of the information, however, did not justify conviction for participation in the sale of unauthorized stock. The words "issue" and "sale" have separate and distinct meanings. *Hidalgo County Drainage District* v. *Davidson,* 102 Tex. 539 (120 S. W. 849). "Issue" connotes the

execution and delivery of an obligation (*Zimmerman* v. *Timmerman*, 193 N. Y. 486 [86 N. E. 540]), and not the underlying agreement upon which these are predicated. See *Michigan Central R. Co.* v. *Morgan*, 227 Mich. 491.

"When applied to bonds, 'issue' may mean the original authorization (citations omitted), or it may mean executed, delivered, or put into circulation (citations omitted), or it may mean the whole process from initial authority to final delivery." *Schumacher* v. *City of Flint*, 252 Mich. 1.

The distinction is well recognized in statutes, 2 Comp. Laws 1929, § 9804 (Stat. Ann. § 28.482), providing, for example, that any person who issues stock, or who sells stock knowing the same to be fraudulently issued, shall be guilty of a felony.

A penal statute must be strictly construed. There was no proof at the examination before the police justice that defendant was guilty of *causing* the preferred stock to be issued, but even assuming that there might be an inference drawn from the testimony and that there was reason to bind him over to the Superior Court for trial, no testimony was offered to show that he was guilty of *aiding* in the unauthorized issuance. Defendant had nothing to do with the issuing of the stock. He authorized the salesmen to take subscriptions on Middleville preferred, he presided at sales meetings of Verseput & Company, and in several instances he advised the company's customers that the stock was a good investment. These activities related to the sale of the unauthorized stock and not its issuance.

For this reason the conviction must be set aside and defendant should be discharged.

CHANDLER, J., concurred with BUTZEL, J.

Boyles, C. J. I agree that the conviction must be set aside but do not concur in discharging the defendant. As indicated by Mr. Justice Butzel, the court charged the jury that there had never been any authorization by the public utilities commission of the *sale* of the stock and that it was for the jury to determine whether or not Bullock and Mr. French were acting in concert to unlawfully *dispose of* this preferred stock. The court indiscriminately used the terms "sale of stock" and "issuing stock." Much was said in the charge to the jury about the *sale,* or the right to *sell* the preferred stock, and whether the commission had authorized the *sale.* However, the information charged that the defendant "did unlawfully *aid in the issuance* of certain stocks." The statute (2 Comp. Laws 1929, § 11077 [Stat. Ann. § 22.101]) refers to the *issuance* of stock, and 2 Comp. Laws 1929, § 11079 (Stat. Ann. § 22.103), declares one to be guilty of a felony who "shall cause to be *issued,*" or who "shall in any way *aid* in the *issue* of," unauthorized stock. From the charge as given, the jury might conceive that the defendant was charged with unlawful sale of stock, and might convict on that ground. The resulting confusion in the minds of the jury is indicated by the verdict as announced by the jury and as entered. The jury found:

"that said respondent is guilty of the crime of violating securities law, as the people have in their information in this cause charged."

There was some proof to indicate that Bullock aided in the *issuance* of at least some of the preferred stock. He became connected with the financial affairs of French several months before French incorporated the Middleville Power Corporation. Bullock was to aid in procuring financing of the com-

pany for French. The initial efforts to procure a
loan having failed, the public utilities commission,
on French's petition, authorized filing articles of
incorporation of Middleville Power Corporation and
the issuance of $50,000 preferred stock. The ar-
ticles of incorporation were filed May 27th. On June
7th, Bullock appeared as the record owner of all
the stock of Roger Verseput & Company. This
brokerage company was insolvent. French put up
the money to take the brokerage company off the
financial rocks, Bullock became its president, French
was its financial backer. Bullock then participated
in selling Middleville Power Corporation stock.
Whether the stock thus sold was in excess of that
authorized by the commission seems to be an issue
of fact. Our record indicates that French juggled
the stock certificates and stock record books, and
that stock was issued in excess of that authorized
by the commission. The issue then becomes one of
fact as to whether Bullock, in engineering the sale
of the stock, aided French in an unlawful issue of
unauthorized stock, not whether Bullock merely sold
the stock. The information charges Bullock with
aiding in the issuance of such stocks, not with the
sale. The case was not clearly submitted to the
jury on that theory.

The judgment must be reversed and new trial
granted.

North, Wiest, Bushnell, and Sharpe, JJ., con-
curred with Boyles, C. J.

Starr, J., did not sit.